The Chief Justice and Burke, J.
were of opinion that the defendant was entitled to judgment; and founded their decisions* on the general grounds contended for on the part of the defendant, that a bond was not a negotiable *401 Instrument, and that the intent of the indorsement on the back of it, could only be to enable the holder to sue and receive the money to his own use ; and upon the further ground also, that most of the old bonds passed away at or about the period at which the present bond was transferred, were disposed of to a set of speculators and others who procured them for one-half of their nominal values, and who, on that account, they thought, should run the risk of the responsibility of the obligors.
Grimke, J.
The motion at present before the court, is a requisition on the part of the plaintiff, for the court to do a thing which is acknowledged by him to be unprecedented, and for which there has not been, and cannot be, any one Instance quoted, or any one authority (which is in point) cited from the law books. Should the court grant this motion, they must annihilate the long supposed distinction between bonds and obligations, and notes or bills of exchange. They must avow that a specialty or deed, can be set over with less formality than the deed or specialty was entered into ; for there is no seal after the defendant’s name, who is the assignor in this case. They must de~ dare that assignments and indorsements are synonymous terms, although they have been held distinct from each Other for many years past. They must acknowledge every person who puts his name on a bond to be a new drawer of such bond, and liable in the same manner as if it had been a bill of exchange or a promissory note. They must concede that every assignee of a bond may sue in his own name, and they múst, if the doctrine of analogy is to be carried to the extent for which the plaintiff contends, deprive every obligor of such equity as he may have against his bond. They must alter the practice of this country in this particular, that an assignee need not sue the obligor to insolvency, before he may bring his action against any pei> sons who may have become security for the payment of such debt. They must agree that it is in their power to *402 alter the well known principles of the common law by con*' struction, and to make an individual liable for the payment of a debt, by implication. But as these are powers not within the jurisdiction of this court,- we must do as we shall do in the case of Rippon v. Townsend; where, although the court have been told what the intention of the legislature was with respect to bonds and notes, yet this court considered themselves as bound down to the technical terms of the law, and to abide by their legal import, though directly contrary to the precise intention of the legislative body. My opinion therefore is,- that the line of distinction which has hitherto been drawn between specialties and notes, must be adhered to ; that assignments and indorsements are not synonymous; that transferable and negotiable paper are widely different; that the transfer of a deed requires the same solemnities as the execution of it j that we must not make a precedent because there is none, and which would operate as an ex post facto effect; that we must not say a blank signature on a paper barely assignable, shall impose , a guarantee on the assignor, without any express words to the purpose ; nor that it becomes negotiable by such a signature, though contrary to the operation and construction of law, and unsupported by any one single case in the books. I have not, in forming my opinion on this subject, paid the least attention to the arguments, ab inconveniently nor to those pointing out the facility with which negotiations could be carried on by bonds, should the opinion of the court be in favour of the plaintiff. For it is the business of the legislature to remedy the first; and as to the second, the same facility may be obtained by settlement made with- bonds even now, where the parties understand the construction of law on this subject; or by reducing them to notes, which is a much more common method of negotiating business at present, than by bonds. I am decidedly of opinion, therefore, with my brethren who have preceded me, that the verdict should be entered up for the defendant.
*403 Watif.s, J.
In considering this case, we have very little assistance from precedents. The English hooks of reports furnish no cases like it; few that have any resemblance to it. The only similar one is that of Bay v. Fraser, tried in this court, and which was determined on principles. I should have thought indeed, that that case might have decided this. But although it is admitted to be an authority ; yet the applicability of it to this has been denied, and even the points which it must have settled (if it decided any thing) have, in a great measure, been set afloat again. It will be necessary, therefore, to reconsider the principles on which the verdict in that case was founded ; for on these, the present one, in my opinion, wholly depends.
The question here submitted to the court is, whether an indorsement in blank on a bond, makes the indorser liable for the amount to the indorsee, in default of payment by the obligor ?
A majority of my brethren have, by the opinions they have delivered, determined that such an indorsement does not make the indorser liable. The question, therefore, must be so decided. But as I have formed a different opinion, it is necessary I should declare it, and my reasons for it j which I will endeavour to do as concisely as the great extent and novelty of the subject will admit of.
There are two lights in which this blank indorsement has been considered.
1st. As making a negotiable contract.
2d. As having the effect only of a common assignment.
In the first of these lights, it has been urged for the defendant, “ that this indorsement cannot have a negotiable 66 effect, and cannot, therefore, imply a warranty, because it a is made on an instrument that is not negotiable either by “ custom or by statute ; and that the general policy of the “ law is opposed to it.”
It is true, that a bond is not made negotiable by any statute, and that the old law of maintenance is averse to the assignment of any chose in action. It has not, however, been shewn, that a negotiable contract cannot be *404 raised by a blank indorsement on an instrument, because k is not-negotiable.
I think the cases shew the contrary. But admitting this proposition to be true, yet I am of opinion, that there are strong grounds on which a bond may fairly claim as much negotiability as is necessary to make it a fit instrument for that purpose. As this is a point of great novelty and importance, I hope I will not be thought tedious in taking pains to discuss it.
I have examined with a good deal of care, the history of the assignments of choses in action; and I draw from it two conclusions : 1st. That the ancient aversion in the law to these assignments, has entirely given way to the general benefit and convenience arising from them in modern times. 2d. That the commercial use of any chose in action, may alone give negotiability to it, without the aid of any statute.
It will require but a very short examination to shew the truth of the first of these conclusions. It will only be necessary to shew that the old rule of maintenance has been almost wholly overthrown. Although this rule may have been a reasonable one many ages ago, when there was room to apprehend vexation and oppression, if the right of going to law was assigned ; yet, as this danger has long ,since ceased, (in this country, indeed, it never had an existence,) and as so much of the property of the citizens now ]ies in contract, it would be absurd and unreasonable to suffer it to continue at the present day. I should not be willing, therefore, to give it countenance in this court. I would not, however, be understood to disregard the ancient rules of law; I hope I respect them as I ought; but to revere them when they are no longer of force or useful, Would be downright idolatry. It may be a matter of curiosity to loqk into the decisions which such rules gave birth to ; but the search can be productive of little utility or instruction. I hope I shall be excused this remark, when it is considered that the whole of the ancient system of law has undergone material alterations, and received in *405 every part the most valuable improvements. The quaint and irregular form of the old gothic structure, although the foundation has been preserved, has been so changed and corrected by the more rational skill of modern jurisprudence, that I might venture to say, the judges of the fifteenth century, and even of a still later period, would scarcely be able, if now alive, to recognise it as the same. It is remarkable that the very doctrine relative to this case, I mean the doctrine of paper currency, was even within the present century, imperfect and unsettled ; and it is only within a few years that it has been fully established.
Co. Lit. si
1 Bac. 157.
Bro. tit. Maint» 7. 14. 17. &e.
A short review of the history of this branch of law, will justify these observations ; and will shew what little respect the old rule is entitled to, and how much is due to modern principles.
By the common law, according to Lord Coke, “ a chose a in action cannot be assigned or granted overand the' reason given is, “ that if this were permitted it would pro- “ mote maintenance, and prove prejudicial to such as, “ though able to contend with those with whom the original “ contract was, might find themselves depressed by a pow-a erful adversary, if it were assigned.” It will be sufficient to quote the sentiments of Mr. Justice Buller on this rule, who has commented on it very fully in the case of Master v. Miller, 4 Durn. & East, 340. “ It is laid down,” says he, ft in our old books, that, for avoiding maintenance, a chose “ in action cannot be assigned. The good sense of that rule “ seems, to me, to be very questionable : and in early as “ well as modern times, it has been so explained away that “ it remains, at most, only an objection to the. form of the action in any case. It is curious to see how the doctrine “ of maintenance has, from time to time, been received in Éí Westminster-Hall. At one time, not only he who laid “ out money to assist another in his cause, but he that by u friendship or interest saved him an expense which he “ would otherwise be put to, was held guilty of maintenance. w Nay, if he officiously gave evidence, it was maintenance ; “ so that he must have had a subpoena^ or suppress the *406 “ truth. Courts of equity, however, from the earliest times, “ thought the doctrine too absurd for them to adopt* and , _ ^ A 7 “ therefore they always acted in direct contradiction to it. “ And we shall soon see that courts of law also altered their “ language on the subject, very much. In 12 Mod. 554. u the court speak of an assignment of a bond, as a thing “ which is good between parties, and to which they must “ give their sanction, and act upon. So, an assignment of “ a chose in action has been held a good consideration for a “ promise. It was so in 1 Roll. Abr. 29. Szvin. 212. And, “ lastly, by all the judges of England, in Moiddsdale v. Bir- “ chalí, 2 Black. Rep. 820. though the debt assigned was “ uncertain. After these cases,” continues Judge Buller, we may venture to say that the maxim was a bad one, “ and that it proceeded on a foundation which fails. But, u still, it must be admitted, that though the courts of law “ have gone to the length of taking notice of assignments of “ choses in action, and of acting upon them, yet, in many “ cases, they have adhered to the formal objection, that the “ action shall be brought in the name of the assignor, and . ° ° “ not m the name of the assignee. I see no use or conve- “ nience in preserving that shadow when the substance is u gone ; and that it is merely7 a shadow is apparent from « tjle letter cases, in which the court have taken care that it it shall never work injustice.” He then proceeds to state , . , . i i 1 i , - these cases m which it appears that the real party, though not named, is as much considered as if he was a party to the action.
By a late act of flie legislature of this signee "of a maintain "'an action m lus See l Dura, & East, 621, 622. 619.
After this decisive opinion of so enlightened a judge, it will not be thought that I have gone too far in saying that this ancient maxim ought not to have any countenance at the present day7. The cases quoted shew how far the English courts have already dispensed with it in the case of bonds, And there is great reason to presume, from the opinion given here by Mr. Buller, that he is fully prepared to say, whenever a fit occasion requires it, that even the shadow of this rule (which is all that remains of it) may be *407 dispensed with, and that an assignee of a bond may prosecute his right, even in his own name.
Mont. 2Í-c. 11.
I will endeavour, now, to shew the truth of the principal position which I laid down, “ that the commercial use of any “ chose in action may alone give it negotiability, without the * sanction of a statutel” I draw the proofs of this from the history of bills of exchange, and of promissory notes. These two kinds of choses in action have long set aside the law of maintenance altogether ; and it is an important circumstance, in the history of these, that neither of them, in their origin., were negotiable ; both, at length, became so, because the interests of commerce required it. The first, according to Montesquieu, were very early invented ; at a time when commerce was confined to a nation covered with infamy. The Jews, enriched by their exactions, were pillaged by the tyranny of princes ; and being chased by turns from every country, took refuge in Lombardy, where they invented this means of eluding violence, and saving their effects. They gave to foreign merchants, and travellers, secret letters on those to whom they had entrusted their effects, which were accepted and faithfully discharged. These letters, then, answered, originally, only a private and special purpose. Being afterwards, however, brought into general use, by the merchants, they received, in the course of time, a fixed form, and were called bills of exchange ; and, being found of general convenience to trade, they were, without the aid of any statute, allowed to be transferred and assigned over as often as was requisite ; sometimes by an indorsement in full, but oftener by an indorsement in blank, both of which equally imply a warranty in the indorser.
Promissory notes are of a much later origin. These have been generally considered as receiving their negotiable quality from the statute of Anne ; but I think, on a fair inquiry, it will appear that they derived this quality from their commercial convenience and utility, and that the statute was only a confirmation of it. Let us attend to their commencement and progress. “ As commerce increased, (according *408 u to Zj/ii, in his treatise on bills and notes, p. 12.) the muh “ tiplicity of its concerns required, often, a less complicated “ mode of payment than by bills of exchange. A trader “ whose situation and circumstances rendered credit from “ the merchant, or manufacturer who supplied him with H goods, absolutely necessary, might have so limited a eon- “ nexion, with the commercial world at large, that he could “ not easily furnish his creditor with a bill of exchange on “ another man ; but his own responsibility might be such, 44 that his promise of payment, reduced to writing for the “ purpose of evidence, might be accepted with equal confi- “ dence as a bill on another trader. Hence, it may reasona- “ bly be conjectured, promissory notes came to be intro- “ duced.” From this account, then, of their origin, by Mr. Kyd, it appears that notes were only used, at first, instead of bonds, being a shorter and more sensible mode of evidencing a debt; and that they were not usedfor negotiation. Sut there is reason to believe that the merchants were very soon sensible of their great convenience in this respect, for we find them very early adopted as a money medium, and allowed all the properties belonging to bills of exchange. The question, however, whether they were negotiable or not, was, after some time, litigated; and, upon looking into the cases in which it is considered, I find that the opinions of the judges on it, fluctuated a long while. At first, the decision was in favour of notes. In the case of Nicholson v. Sedgwick, 1 Ld. Raym. 180. in the common pleas, the court construed a note in the same manner as they would then have construed a bill of exchange. This case has been found fault with since, by Lord Mansfield., (in Grant v. Vaughan, 3 Burr. 1522.) but it was because it did not go far enough ; because it did not admit that on a note payable to A. B. or bearer, an action could be maintained by the bearer. Lord Mansfield on this occasion mentions, that it is difficult to discover, from the reports of the cases on this head at that time, when the question arises upon a bill, and when upon a note ; for the reporters use the words note and bill promiscuously. This evidently shews that they were then both regarded in the *409 jame light. Afterwards, however, in the court of king’s “bench, where Lord Holt presided, the negotiability of notes rarae more directly into question than it had yet been, and the decision was against it. I find, indeed, a case in Ld. Raym. 744. where Lord Holt has, in some degree, allowed it. But in the case of Clerk v. Martin, 2 Ld. Raym. 758.* the report states that he opposed an action brought on one iotis vcrilms. And notwithstanding the whole body oí merchants were extremely anxious to carry this point, and had long settled it in their practice ; notwithstanding, too, some of the other judges leaned strongly in favour of it; j'et, Lord Holt pertinaciously adhered to his opinion ; and the great authority which this appears to have had in Westminster-Hall, made others, at last, yield to him. 4 Durn. & East, 151. The merchants were, therefore, forced to apply to the legislature for relief, and the statute of Anne passed. But it is remarkable that in the preamble to this statute, it is recited, that, “ whereas it hath been held that notes, &c. "5 are not assignable or indorsible overwhich strongly intimates that the opinion of the court was not thought right, and the statute was made to remedy it. And this construction is directly given it in the case before mentioned of Grant v. Vaughan, by Mr. Justice Wilmot, who says “ it a was made expressly to obviate the doubts on this subject,” and not to introduce any new law.
3 Burr. 1525.
3Biii'~15~
From this historical view of the doctrine of assignments of choses in action, I think it is manifest that they are now neither odious nor dangerous, but that modern decisions rather give encouragement to them ; and that the position which Í laid down is a just one, namely, that the commercial use of any chose in action, whatever might be its form, is alone sufficient to make it negotiable, it was so with bills of exchange; it was afterwards so with promissory notes,. For, although these last are declared negotiable by the sta *410 tute of Anne, yet, it is very clear, that if it had not been for the obstinacy of Lord Holt, such a statute would have been unnecessary. These are the grounds, then, on which negotiable instruments stand in England. It will be said, bonds are not admitted there as such. I answer, they have not yet been wanted there for negotiable purposes. But if general utility, and a convenience to trade, have been allowe.d to legitimate the negotiability of bills and notes, and if these are the true principles on which that quality depends, bonds have, in this country, a very strong claim to it, founded on these principles. When I urge their convenience to trade as a ground, I do not mean the trade solely of merchants, but the general dealing of the whole society. This is what is understood, always, when speaking of the commercial use of bills of exchange, or promissory notes. Any man who is not a merchant may draw a bill, and it will be negotiable. So will be the note of a planter, if made payable to order, although it circulates oniy among planters.
Let us advert now to those extraordinary circumstances which have given to bonds a claim to this new character, in this country. Before the revolution, it is probable, they were as seldom transferred here as they have been in England. The paper-u'one}' of the country, with the specie then in circulation, were fully adequate to all the purposes of trade and general exchange. But, on this great event taking place, peace and independence opened splendid prospects to .the poorest man in the community. Each one felt his resources swell, and believed them equal to any speculation. The delusion was almost universal; even the most sensible men fell into it. Some bought lands and negroes ; others adventured in commerce ; all engaged in extensive schemes of private advantage. There was, at the same time, a large domestic debt to be settled, which had been accumulating during a long war. To answer these various demands for money, the little specie which the British had left was very inadequate, and the paper-money was now annihilated. Old bonds and notes were therefore substituted, and became the chief circulating medium of the state. They *411 served extensively for the purchase of every kind of property, and they answered, by negotiation, the beneficial end of settling a great part of the debt of the citizens. There never was a period in England, or in any other country, when bills or notes were more useful than bonds were at that time in this. Their utility was not confined to one class of men, as was the case, for a long while, with bills of exchange ; nor were they, as Lord Holt contemptuously said of notes, “ invented in Lombard-streetbut they were instruments long recognised by the law, and adopted as a kind of paper currency, by the whole community.
If, then, general use and general dealing made notes negotiable, Í infer that bonds may become so, since the same principles operate so strongly in their case. And therefore, if the position was true “ that a negotiable con-w tract could not be raised by a blank indorsement on an in-u strument that is not itself negotiable,” yet a bond would, in this respect, be sufficiently qualified. I do not mean, however, to say that the original contract of a bond may become negotiable; I think that there are sound reasons against it ; all that I would insist upon (and I beg I may be so understood) is, that a bond may serve as the instrument of a negotiable contract by indorsement, in the same manner as a bill or note not originally made payable to order.
What then would be the decision on such a bill or note i
In the case of Hill et al. v. Lewis, 1 Salk. 133. it was held, even by Lord Holt, “ that an indorsement of a note “ not payable to order, makes the indorser chargeable to the “ indorsee, though not the maker of the note.” This case expressly proves that an indorsement on a chose in action, that is not negotiable, creates, notwithstanding, an implied warranty in the indorser. It is most probable that this was a blank indorsement; for this kind has been always more frequent than the indorsement in full. This case, then, is exactly similar to the present one. It may be said, indeed, that it was determined after the statute of Anne, but that *412 circumstance can make no difference.* For, admitting thai the statute was really the first parent of promissory notes, ... J . . 1 ,, . J yet, it only makes a note that js not payable to order a legat instrument; it confers no negotiability on it. But a bond has been- always recognised as a legal instrument, and is, in •every respect, the same as such a note. The statute creates no distinction; nor can reason distinguish between them» One is an engagement to pay money to a particular person only ; the other is the same thing, and nothing more. The equity against a bond adheres to- it always ; so any equity or legal discount against a note, not payable to order, will accompany it in the hands of every assignee; for the action in both, must be brought in the name of the first payee» They are also the same in a commercial view. A note not payable to order, has no more resemblance to a bill obex» change than a bond has. It is made analogous to it by in-dorsement. So a bond, when it is indorsed, becomes an Order from the indorser on the obligor; to pay to the indorsee ; which is the very definition of a bill of exchange. It is the one given by Lord Mansfield, in 2 Burr. 676. And it was declared by the court, in 2 Ld. Raym. 1397. that no precise words are necessary to be used“ Deliver such a sum of M money,-” makes a good bill of exchange.
It appears then from this case in Salkeld, that it is no obstacle to the negotiability of an indorsement, that the original contract of the instrument on- which- it is made, is not negotiable. The indorsement there, was not considered as-assigning a right,- but creating an original one. And the question here is not whether the assignee of a bond can recover in his own name from the obligor, by virtue of the *413 indorsement — -but whether a new and original contract is not created by it, between the indorser and indorsee ? 1 can see no legal objection to it: on the contrary, it appears that every reason for it in the case of a note, applies forcibly in the case of a bond. Might not even a forged note serve as the instrument of a negotiable contract by indorsement ? Then why not a bond ? The truth is, that the original con» tract is not regarded. Whether negotiable or not, or whe= ther void or not, makes no difference as between the indor-ser and indorsee. “ Every indorsement,” says Lord Mansfield, “ is a new contract.” It is immaterial of what nature the instrument is ; it is sufficient if the indorsement is used for negotiation.
This doctrine is fully established by a great number of cases. It is directly held in the case quoted from Salkeld It is directly held also in the case of Langstaffe v. Russell, Doug. 496. for in that the indorsement alone was considered, and there can be no doubt that the decision would have been the same, if the blank checks there had been filled up as notes not payable to order, which would have been the same as so many bonds. It is further confirmed in 2 Burr. 374. 3 Burr. 1354. Doug. 611. 617. 2 Black. Rep. 1269. But it is more' completely established in the case of Bay v. Fraser, which I will now proceed to consider.
It will be necessary first to state the substance of that ease.
A bond of Thomas Elliott for 200/. to the defendant, fiohn Fraser, was transferred by him to John Hall, by an indorsement in these words : “ Pay the within to John Hall, st or order, for value received.” It was afterwards indorsed in blank by Hall, to the plaintiff, Mr. Bay, who' brought an action against the first indorser, Fraser. It appeared in evidence, that the debtor, Mr. Elliott, was insolvent at the lime of the first indorsement, and was therefore never sued. This cause was tried in fuñe, 1730, before Mr. Justice Dhaytom and myself, and we were of opinion, upon general principles, and on the authority of the case in Salkeld-. *414 that the indorsement on the bond made it a bill of exchanges, as between the indorser and indorsee.* The jury being of the same opinion, found a verdict for the plaintiff.
In quoting this case, I would not be understood to rest the authority of it on the opinion of the Judges who tried it; because that-opinion (I speak at least of myself) was suddenly formed, as is always the case on any jury trial, and therefore ought not alone to have the weight of a precedent. But there is still a strong reason why this case should be regarded as a respectable authority. The verdict given in it, was the judgment of a special jury of some of the best informed and most judicious merchants in this city, on a great commercial question. And this verdict has directly determined that a bond may become the instrument of a negotiable contract by indorsement. In doing which, it worked no mischief. It did not interfere with the original contract; it did not take from the obligor of a bond any equity he might have; but only determined that a bond, like a note not originally negotiable, may become the foundation of a new contract, which shall be so.
Let us examine how the difference, which was so much relied. on, between that case and the present. It was contended, that in the case of Bay v. Fraser, the indorsement was filled up, which, it was admitted, made it a bill of exchange ; but that in this it is in blank, which has the effect only of a common assignment.
I have attended with great care to every thing that has been said in support of this distinction ; but I have heard nothing that satisfies me that it has any legal foundation.
What is a blank indorsement? Not a thing of'doubtful nature, or of various import. It is a technical form, that means exclusively a commercial transfer; contrived by the merchants as a shorter and more emphatical mode of giving-negotiability to a chose in action, than an indorsement in full. There is no other kind known either in law or custom j *415 and these have invariably given to it the same construction, as to the indorsement in full. It is in effect a mercantile abbreviation of the words “ pay the within to A. B. or or- “ derwhich is the indorsement in. the case of Bay v. Fraser.
But it was insisted that this was not the effect intended to be given to a blank indorsement in the present case. How does this appear ? Not, certainly, from the indorsement itself. “ It would be false logic,” says Mr. J. Butter, (in Hodgson v. Ambrose, Doug. 329.) “ to put a different sense “ upon any words from what, in general, they import, by “ mere inference from the words themselves, unexplained^ “ by any others.” It was insisted, however, that the popular construction is different, and that a blank indorsement on a bond means only a common assignment. I am aware that it was sometimes the practice, formerly, to assign a bond by the assignor only writing his name on the back of it j but he affixed his seal to it; and there was alwaj's a witness to the act, who also signed his name ; all this, too, was done at the bottom of the bond, to leave room for filling up the lengthy form of an assignment ; every thing,, therefore, de-? noted that a common assignment was intended. But here there are no such indications ; here is singly the name of the indorser, written in the way it is always done on a bill or note, and which all the world understands as a negotiable transfer. If a common assignment was intended, why was not the old form adhered to ? Or why not adhere to the type of it, which would have been very little trouble ? Why adopt a form that is purely negotiable ? The inference is, that a negotiable effect was intended. This is certainly the legal construction of it; and, in my opinion, it is the popular one also. Many, no doubt, have understood it differently$ but I believe if the sense of the whole community was taken, it would be found that most men have understood that, when they put their names in this way on bonds, they made themselves ultimately liable if the obligors were insolvent at the time ; and where a person has intended not to make himself so liable, he ha^ usually stipulated specially *416 against it. The general experience of the bar will determine whether I am right or not. But, admitting that this sense did not predominate, yet, there is one fact that cannot be denied, which is, that the popular sense is at least, doubtful. This, alone, is, in my judgment, decisive for the plaintiff j and we are bound to give to this indorsement a technical construction.
Wherever a particular intention is allowed to control the legal effect of words, the law requires that such intention shall be either expressed by other words, or be necessarily implied. If it is doubtful, it never can prevail. It is so in the case even of a will, in which the intention is allowed a greater latitude than in any other. It was so determined in' the case of Calhoun v. Anderson, where an indorsement, on a copy-writ, of the words “ special bail,” and subscribed by the defendant, was held equivalent to. a formal recogni-sance. It was there urged, as has been done here, that the defendant did not mean the indorsement in its technical sense. The opinion then declared by the court, is the opinion I now hold, “ that where a man uses technical 54 words, and does not explain or restrain them by any “ others, we are not at liberty to say that he did not under» u stand their technical meaning, and that he shall not be u bound by it.” Here there is a commercial transfer, which implies a collateral security,' A blank indorsement on a chose in action was never known to be used for any other purpose; and custom and law have universally affixed this single meaning to it. There appears, on the other hand, no legal intention to the contrary. I say legal intention, because the law suffers no other intention to vary the technical import of words, than such as is expressed by other words in writing. Here there are no such, nor any formal act; such as a seal, or other thing, which might be equivalent to other words. How then can we say that this is not a commercial transfer ? Or how can we, consistently with the rules of law, give to this indorsement any other sense than, that which the law has imposed on it ?
*417 The case of Bay v. Fraser is also applicable to this point. There, although the indorsement was filled up, yet that indorsement expressed no warranty. The words “ pay the “ within to J. Hall, or order,” if restricted to their literal sense, only amounted to a transfer of the debt: and I remember this was strongly insisted on; but these words made a negotiable transfer, and there were no other words to the contrary; they were therefore construed to imply a warranty. That is precisely the present case. I can see no difference between them. They both rest on the same general principles ; and if this case cannot be supported by them, the doctrine in the case of Bay v. Fraser ought not to stand.
I will now consider this indorsement in the second light i,n which it was viewed, viz. as a common assignment. The opinion I have already declared on a different view of it, might indeed excuse me from considering it in any other. But as I am of opinion also, that in a case of a common assignment, the plaintiff is entitled to a remedy, I .shall, without entering into any lengthy discussion, state shortly the reasons on which I found this judgment. It was contended for the defendant, that a common assignment (which it was said this indorsement was) implies no warranty, but only a covenant that the assignor will permit the assignee to receive the debt to his use 5 and a passage from the civil law, with several cases from the common law, were quoted* as supporting that position. I have hitherto deferred taking any notice of these cases, because in viewing this indorsement as a negotiable transfer, they could not possibly apply ; for if a bond thus indorsed assumes the nature of a bill of exchange, it must be governed by the law of merchants. Neither the civil law, nor the old common law, ever contemplated a bond in this shape and character. The cases from the common law, *418 all relate to a common assignment drawn in the regular form, and expressly proceed on- the construction of the word “ assignavit’’’ used in th'at form ; they can only therefore apply to this indorsement as viewed in that light. But even in this application of them, they do not, in my opinion, decide any thing, and ought not to have any weight. The whole amount of what they all say is this, that one effect of an assignment is a covenant that the assignee shall receive the money to his use ; but they none of them say that this is the only effect. Nor is this a necessary inference from them. It would be false reasoning to infer that, because , the law gave a remedy for one injury, it would refuse a remedy for another. The rule of “ expressio il unius est exdusio alteriiis,” is not justly applicable to them. It applies only to statutes, contracts, &c. For it is not always that the court in construing a thing, declares all its legal consequences ; it was very unusual for the judges formerly to do this ; and it is only since the time .of Lord liardzuicke and Lord Mam-field, that we meet with complete illustrations of any doctrine of law in a single case. But I do not rely on the inapplicability of these cases. I take a very different ground. Í will admit that if this-point had been then considered, the court would have decided (as the counsel for the defendant contended) that there was no warranty implied on an assignment of a debt, unless there was some fraud in the assignor. Such a decision would most probably have then been made, for two reasons, 1st, Because the judges of that day still preserved some veneration for the old law of maintenance. 2dly. Because the law of implied warranties, as it then was, would have justified the decision. But I think I have shewn that the law of maintenance, as it respects this case, has been overruled ; and it will fully appear, upon a further examination, that the lav/ of implied warranties has materially changed from what it formerly was.
It is proper here to state, than an assignment of a debt :s a contract in nature of o sale. It is expressly declared to be so by the civil law, It must therefore be governed *419 by the general law relative to sales, unless some particular exception can be shewn in the case of a debt.
Id. 76.
id. so.
Id. 5.5. z’d.
Book2i.c. ir.
I will not deny that such an exception was made by the ' - . . . , i civil law. In the passage from Do/nat, it is said, the seller of a debt ouglit not to warrant that the debtor is “ solvent, for he sells only the right.” There was no warranty, therefore, unless the seller specially agreed to it, “ nisi altud convenitBut a contrary rule is laid down for all other sales. It is said, under the same title, that the seller is answerable for all the defects of the thing sold, by natural warranty, whether they are known to him or not; “ for he ought not to reap the advantage of an apparent “ value which the thing seemed to have, and yet had it s( not.” This principle is made to extend to all contracts, and to all covenants. Why then was this exception made in the case of a debt ? The reason is not given here. My own conjecture is, that it originated in the same cautious policy that gave rise to the old law of maintenance in England. The civil law does not indeed go so far as to prohibit the assignment of a debt, but it probably intended by this rule to discourage it. And the general dealing of the Romans did not require the contrary. The making dioses in action subservient to the purposes of trade, was not known or even wanted among them. According to Montesquieu, the Roman people troubled their heads very little about trade. They were not .jealous of Carthage because she rivalled them in this respect, but because she rivalled them in glory. Their military education, and even the form of their government made them averse to commerce 5 and it was a saying of Cicero, “ that he did not like that the “ same people should be at once both the lords and factors a of the universe.” Their laws, therefore, shew very little concern for the interests of commerce in any shape ; chey are totally silent on the subject of negotiable paper j and the passage here quoted, with another under the title delega-. tion, 1 Dorn. 494. are all that I can find respecting the transfer of a debt.
*420 If I have assigned the true reason for this rule of the civil law, it ought now to cease like the old commpn law maxim, for the reason has long since done so; and I might venture on this ground to deny its authority. I might also insist that the civil law has no intrinsic obligation here, and that it can only recommend itself as a rule of reason ; and on this ground too I might deny its authority. But I feel more directly authorised to do this, when I find the contrary rule of the civil law fully recognised by the decisions of this court, and confirmed by the soundest principles of our own law.
I have said that the law of implied warranties was very different now from what it formerly was. It has changed even within a few years. By the. common law, an action on an implied warranty could not be supported, unless there appeared to be some fraud -in the seller. In 2 Black. Com. 452. it is laid down, “ that the vender of wares is not •i bound to answer for the goodness of them, unless he ex- “ fressly warrants them to be sound and good, or unless he “ knezu them to be otherwise, and hath used some art to “ disguise them.” So it is said by Lord Mansfield, (Doug. 20.) “ that on a sale even for a sound price, if the thing a sold proves unsound, and there is no express warranty, “ it ought to be laid that the seller knew of the unsound- “ ness.” If it is necessary to lay this, it is necessary by the rules of pleading, to prove it. So that a warranty, according to these authorities, can only be implied on the ground of some fraud in the seller, I remember to have found myself bound by these great authorities to state the law in this way on more than one occasion, after my appointment to this seat, and it'was some time before I felt at liberty to depart from them ; not because I thought the doctrine just or reasonable, but because it was the law. But the broad rule of the civil law, which implies a warranty on every kind of contract was constantly contended for by the bar, and the strong reason and justice of this rule weighed so much with juries, that it was always recognised by their verdicts, and has now become as completely established in *421 this court as any other rule of law. Numerous decisions both here and on the circuits, will therefore authorise me in stating the law of implied warranties at present to be this.
1 Bom. 244.
1 ®om*
When a man buys a thing, he bays it for some certain use and benefit; he does not mean to give his money for nothing. If, therefore, the thing sold has any defect which will prevent him from receiving the benefit he expected from it, he has been deceived. This happens, sometimes, by the fraud or misrepresentation of the seller ; in which case it never was doubted that the seller would be liable. But it may happen also by the thing appearing to have a value which it has not, and this without the knowledge of the seller, or any fraud on his part 5 this is what the civil law calls “ dolus re ipsa,” a cheat, or defect, in the thing itself and is expressly distinguished from fraud : in this case, too, if the defect is of such a nature as to make the thing useless, or materially disappoint the views of the buyer, so that, if he had known it at the time, he would not have bought, the contract is void, and the seller is bound, not only to restore the money he has received, but to indemnify the buyer for the charges he has been put to by the sale. This is agreeable to the rule of our law, “ that where one of two “ innocent persons must suffer, he who has occasioned the el mischief shall bear the loss.” It is agreeable also to another rule of law, which says, “ that when money is paid on M a consideration that fails, the party receiving is bound to u refund it.”
Now, let us apply these rules to the present case. The plaintiff pays money, or gives some other value to the defendant, for a bond which turns out to be worthless, the debtor being insolvent. I agree that it is necessary that this insolvency should have existed at the time of the transfer, for a defect which vitiates a sale must be one inherent in the thing at the time it was sold, and not a subsequent one. But the debtor here was insolvent at the time of the transfer of the bond, because the special verdict states that all due diligence to recover it was ineffectual. There was, therefore, *422 an inherent and essential defect in it; for the value of the bond does not consist in the paper or writing, but in the solvency of the debtor, and his insolvency renders it a nullitys The plaintiff, then, has been deceived. He expected that the sum due on this bond could be recovered. It is too absurd to suppose that he intended to buy only the right. This might be an empty thing. It might subsist, and yet be productive of no benefit ; and he would not be so foolish as to pay his money for the right of bringing an action that would yield him nothing. Men have been vain enough, sometimes, to purchase empty dignities, but it would be a curious kind of vanity to buy, at a great price, the right of going to law. It is much more reasonable to presume that the plaintiff meant to buy the fruits of this right, which was the money which was to proceed from it. If, then, the bond could not be recovered at the time it was sold, the plaintiff’s views in buying are totally frustrated ; for the bond can be of no use to him; it is even more worthless than “ a beam “ that is rotten, or a broken-winded horse,” which are the examples given, by the civil law, of defects sufficient to dissolve a sale. The contract therefore, in this case, ought to be rescinded. The consideration on which the plaintiff has paid his money has failed, and the defendant, “ ex cequo et bonof ought to refund it.
This principle is deeply founded, both in reason and justice ; it is perhaps the most extensive in the law.
If the assignment of a bond is not in nature of a sale, (as I have stated it to be,) or if it is in any other contract, this principle will still reach it. It governs, universally, all contracts ; it extends even to illegal ones ; and the u particeps II criminisf as well as the most favoured party, may avail himself of it.
In the case of Walker v. Chapman,* (stated in the case of Lowry v. Bourdien, Doug. 454.) a sum of money had been ,paid, in order to procure a place in the customs. The place had not been procured, and the party who had paid the *423 money brought his action to recover it back ; it was held that he should recover. So, in the case of Munt v. Stokes, 4 Durn. & East, 564. where the contract was also an illegal one, ulr. J. Buller says, “ in the case of illegal contracts, “ one party cannot recover against the other on the contract “ itself 5 but if he comes to rescind it, he may recover back “ so much money as he paid” Vi ill then a court of justice give a remedy in contracts which the law prohibits, because the consideration fails, and will it deny it in one which the law sanctions ? After these cases, one would conclude there would be no possible contract which could elude this powerful and searching principle. It would be tedious to quote the numerous cases in support of it. '1 he books teem with them. I have referred to these only, because they carry the principle as far as it can go.
There is one objection more which I will take notice of. It was much insisted on, by the defendant’s counsel, that the transfer of bonds was a gambling kind of commerce, in which large discounts were made, on account of the risk of recovering them ; and that if they turned out bad, the assignees were to bear the loss. But this is not a fair representation of the case. I admit that a few monied men have availed themselves of the scarcity of money, and the necessities of those who were obliged to sell their bonds, and have bought a great number at considerable discounts for cash. But was this owing to the buyers’ running the risk of being paid ? This could not be the reason, because notes that were negotiable were bought at the same rate ; and if these proved bad, the indorsers of them were unquestionably liable. It must have been owing, then, to a different reason. In my opinion, the only true one was the scarcity of money. This depreciated not only bonds but every kind of property. It gave to money a relative value far beyond its usual standard, and lessened, in the same proportion, the value of every thing else. Negroes, the most productive property we own, were sold for half price, as well as bonds. Lands were still more depreciated. Now, I would ask, if any of these, on being sold, were discovered to be so defective as to be use *424 less to the buyer, would it be an objection to an action to recover back the money paid, that the property was bought for less than its value l As the law is now settled, it certainly would not. And why should it be; an objection in the case of bonds ? Although a bond may have been bought at a great discount, yet, if it was worth nothing at the tinte it was transferred, has not the consideration failed, and ought not the money paid for it to be refunded ? Surely, the buyer of a bond has as high a claim to relief as the party to an illegal or corrupt agreement. His contract offends against no law, nor is there any fraud or immorality in it. And yet we have seen that, in contracts so polluted, the parties who have paid money on void considerations shall, notwithstanding, be relieved.
There appears to me, therefore, to be no more weight in this objection, than in any other. This too is viewing the subject in the most unfavourable light. It is also a partial one; for it is not generally true, I believe, that bonds were transferred from one to another at large discounts. Many, no doubt, were; but the greatest number, I am convinced, have passed at their full value. An indulgent creditor, in many others, has consented to accommodate his debtor by giving up his bond for the bonds of other persons, and when he has received these, he has delivered up his debtor’s for the same amount. In all these cases, a full equivalent is given for the bonds that are assigned ; and it cannot be pretended that any allowance is made in the price for the risk of recovering them. If then, in any of these cases, the bonds should appear to have been worthless at the time they were assigned, will it be denied that the consideration has failed ? Did the seller of valuable property mean to be paid with waste paper, or the indulgent creditor to be requited for his kindness by the loss of his debt ? This would be too absurd a presumption. They expected an equivalent. The assignors also of the bonds intended to pay an equivalent for what they had received ; and if they had not done so at first, they are bound to do so afterwards. Nor is there the least hardship in their case. *425 The bonds were worthless, if the obligors were insolvent when the contracts were made ; and they would have continued to be so if they had not been assigned. If, therefore, the contracts should be rescinded, and the parties replaced in statu quo, the assignors will be in no worse condition. And if, instead of that, they are compelled to make good the amount of the bonds, they will be only paying for the first time for a valuable and ample consideration, which they have already received. I will only add, that it does not appear that the present case is not one. oi these ; and it is fair to presume that there is both honesty and good conscience in it. If, howaver, it is otherwise; if the demand is unreasonable, the defendant may have relief elsewhere.
On every ground then, and in every view of this question, I am of opinion that judgment should be for the plaintiff. All the cases, and all the doctrine on the subject, proclaim this universal rule, “ That the law will not suffer, 6i in any contract, one man to take money from another, w and give him nothing in return.” As the facts in this case bring it fully within this rule, I infer that the plaintiff' has a right to recover. If the indorsement is considered as a negotiable transfer, he has to recover on the special instrument; if as a common assignment, his right is equally clear on the count for money had and received.
I am sorry to have taken up so much time. But I thought it necessary to do so, as I differ from those whose opinions must have great weight. I have endeavoured to justify my opinion on those grounds on which every judicia one ought to stand — I mean the grounds of law. Whether I have succeeded or not, I have at least the satisfaction to know that I have exercised my judgment in the best manner I was able.
Bay, J.
The principal objection which is urged to the plaintiff’s recovery in this case is, that a bond is not in its nature negotiable, so as to enable the holder to bring an action *426 in his own name ; that even an assignee in due form, cannot sue in his name for the amount, but must sue in the name of the obligee. To support .this objection, have been cited, 1 Inst. 282. 12 Mod. 554. and 1 Ld. Raym. 683. Before I proceed further, I would observe, that these two last cases cited by the defendant’s counsel, shew expressly, that although a bond is not a negotiable instrument in its nature, yet a contract may be formed upon it between the assignor and assignee, which shall be binding on them, where the obligor is entirely out of the question. It was next urged, that the passing the bond in the manner stated in the special verdict, was a bare relinquishment of a right, which raised no obligation. To this, however, it may be answered, that the finding of the jury in the verdict implies a sale; for it states, that it was given in payment to the plaintiff by. the defendant, for a valuable consideration, which amounts to a sale in law. The transaction may be considered also as an exchange ; and if so, it is clear that all exchanges are governed by the same rules of law which regulate sales. The case cited from Domat's Civil Law, 79. 'where it is said, that “ in transfers of a debt, one ought “ only to warrant that it is really due, and not that the “ debtor is solvent,” seems to' be rather a rule laid down, by which prudent men should govern themselves, than a binding or universal principle, which is to govern contracts. For the same author, in treating further on the same subject, (page 494.) says, that “ the assignment of a debt, is as it were, the sale of what is owing by a third person and all sales imply a warranty.
By the principles of the common law, I do not see that the want of negotiability in the bond, affects in the least the contract between the indorser and indorsee. Had the dispute in this case arisen between the indorser and obligor, then I confess all the reasoning on the part of the defendant, would apply. But their arguments tend chiefly to shew, that the holder or assignee of a bond, cannot maintain an action in his own name against the maker of it. This has not been denied. The real question before us is, whether *427 a separate and distinct contract cannot be made upon a bond between the obligee and a third person, not named in the bond. I think there can j and that the present is a contract of that description, trill appear evident from the analogy between other choses in action and promissory notes, before the statute of Anne. Before this statute, notes of hand, like bonds, were not negotiable. They were only considered as mere assumptions to the payee ; yet if a note was indorsed over by the payee to a third person, it became a new contract between such payee and the person who held it; and the indorser of such note was liable to him for the amount, although he could not sue the maker of the note in his own name. So in like manner, a note payable to the bearer (which is not negotiable) is recoverable against an indorser, if he indorses it over to another. The cases cited from Salk. 133. and Holt, 117. are in point on this bead. They both agree that although a bill made payable to I. S, or hearer, be not negotiable •, yet if it be indorsed, the indorser shall be liable : because every indorsement is a new bill, and shall have the same effect between the in-dorser and indorsee. How if this were the case on promissory notes before the statute, and on bills payable to bearer, neither of which were negotiable in their nature, what is to prevent a similar kind of contract from being made on a bond ? Is there any thing in the seal and wafer attached to a specialty, which prevents this new contract from being made on it, more than upon notes and bills ? I can see none. The case of Bay v. Fraser has settled this point fully, and established the doctrine that such a contract may be made upon a bond, so as to be binding between the in-dorser and indorsee. But in order to distinguish the cases, it is said, that the indorsement upon the back of the bond in that case, was filled up and signed by the obligee, at the time it was transferred, and that it was made payable to order, which gave it a negotiability from him for the amount of the contents of the bond. That it was, therefore, in nature of a bill of exchange drawn upon the bond $ and upon that ground the plaintiff recovered ; whereas, in *428 the present case, it is said, no such bill was drawn, only a blank indorsement made, which imported no more than a bare relinquishment of the obligee’s right. In order to give an answer to this last objection, it will be necessary to consider the intent of the parties when this negotiation.took place ; for it is a rule of law, which is founded in wisdom, that the intention of the parties, when it can be discovered, ought to govern in all contracts. (Pow. 372.) But in order to throw greater light on this subject, it will be more regular to take into view the situation of the country at the time this contract was made, and the causes which occasioned this species of transfer.
It will not be denied, that the revolutionary war, and the necessities of the citizens, which sprang out of it, threw a vast number of bonds and securities for money into circulation, far exceeding all calculation. In the first place, a great number of debts and demands remained over and unsettled, from the commencement of hostilities until the peace ; when the creditor was restrained by an act, from suing and recovering; (except for interest;) but he had a right to bonds payable by three instalments, and security for the principal. This regulation, consequently, threw three times the number of bonds into circulation than would have been otherwise requisite for all those debts. All the confiscated property was sold upon a credit of one, two and three years, agreeable to the principles of the act for the recovery of debts, with bonds payable at these periods. This, therefore, added greatly to their number. Upon the same principles also, almost all the sales of private property of that day, were likewise made on a credit of one, two and three years. So that in fact, instalments and instalment bonds seem to have been, at that time, the order of the day. The sheriff’.s sale hill which passed about the time these bonds became payable, which permitted a tender of pine barren land to the creditor in satisfaction of the demand, threw a further impediment in the way of recovery of debts, until after the adoption of the late federal and state constitutions. During this period, the current coin had *429 been gradually drained out of the country, so that there was scarcely any circulating medium left for the payment of debts. In this situation of things, many honest men were desirous of paying off their debts, but could not raise money for that purpose, although they had good bonds in their possession, bearing interest. Necessity, therefore, gave rise to an offer of these bonds in payment, and the creditors finding they could not well better themselves, in many cases accepted them in payment; and thus it happened that bonds to an immense amount were sent into circulation. And it is certain that they relieved the distresses of the citizens exceedingly, as they passed by common consent from hand to hand, as notes of hand or any negotiable paper j and for the greater ease and facility of transferring them, the custom of signing the obligee’s name, without any writing above it, was introduced, so as to enable tbe holders to make any use of it he thought proper. It must be recollected, however, that by far the greater part of these bonds were passed off in payment of debts ; and others were given for purchases made at sales ; in both which cases, a full value was given for them by those receiving them in payment. It is very probable that many bonds were passed off greatly under value, and eventually became objects of speculation. But the special verdict in this case does not state this to have been one of that kind of contracts, and the court is not to presume it; it therefore cannot affect the general principle.
■To return, however, to the subject of the intention of the parties. What was, or could have been the intent and design of the parties in nineteen-twentieths of these transactions ? The intention, it is presumed, must have been fair and honest, and if so, then it must have been in the contemplation of the parties that he who was under the original obligation, and who had received a valuable consideration» should make good to him who had the right of demand, that which he gave in payment, in case of a deficiency, or insolvency of the obligor, whose bond had thus been passed away in payment of a just debt ¡ and not barely, as has been suggested, that he was only to warrant that the debt was due *430 from such obligor. This, I presume, is an honest construction of the intention of the parties, in all such transactions, and such as will promote good faith and fair dealing between man and man» Taking this then for granted, I think it may very justly be inferred that the custom of making a blank indorsement on a bond, was not only to authorisé to sue and recover, as has been contended; but also to make what use the holder pleased of it, either for the purposes of an acquittal in case of payment — or to make the indorser liable, in the event of insolvenc3r, on the part of the obligor. The case of Russell v. Langstaffe, Doug. 496. is strong in support of this point, where it is laid down, “ that an indorsement in “ blank, will bind the indorser for any sum which the per- “ son to whom he entrusts it chooses to fill up, and it shall (l not lay with him afterwards to say it was not regular because such was the intent of the parties. If such was not the intention, why not make use of the old form of assignment known in law, and of which the books are full of precedents ? This very circumstance proves to my mind, that this deviation from the old at customed method of assigning bonds, was intended to introduce a new custom, both for the purposes of facility and security ; and fully authorised the holder to write over the name of the obligee indorsed on the bond, a bill of exchange, or any thing else he pleased, so as to make him liable. This appears to me to be founded not only in reason and justice, but on the authority and analogy of sundry adjudged cases in the books. In the case of Fenner v. Mears, (2 Black. Rep. 1269.) it is laid down, that if the obligor of a bond himself, had put his name on the back of a bond, this would have raised a new contract between him and the assignee to whom it might be passed, that he would pay it, free from all discounts or in-cumbrances, as between him and the obligee ; in which case assumpsit would lie by such assignee, against the obligor on such implied agreement, for the whole of the principal and interest on such bond ; notwithstanding he might have had good discounts against the obligee, which must have been allowed him, if he had been sued on the bond in the name *431 of the obligee. This case appears so strong in point that there is no stepping over it. If then, the bare putting the name of the -obligor on the back of the bond, raises a new contract between him and the holder, and obliges him to pay the whole, principal and interest, though he might have fair discounts to the amount of the bond ; surely, with much snore justice, ought the obligee in the case under consideration, to be bound by his blank indorsement, to the holder for the amount of the principal and interest of the bond which he passed off for a full consideration.
There is the same reasons for the law to raise the implied assumpsit in this case as in the one cited ; and for concluding that it was a new contract, to repay the holder in case of the insolvency of the obligor. Indeed, if we reason from analogy, the case is much stronger.
Again, it io clear law, that the intent of an indorsement is a warranty that the bill shall be paid. 3 Bac. 607. Ld. Raym. 181. Sir. 497. And can any good reason be assigned, why such an indorsement on a bond should not amount to a warranty that the bond should be paid, as well as an indorsement on a bill of exchange l I confess I can see none.
There is still another ground, however, on which this case may be considered, which is stronger, if possible, than any of the former ones \ that is the equitable ground for money had and received., and on the implied warranty upon every sale for a valuable consideration.
The principal objection to this ground has been, that dioses in action cannot be sold; and therefore, that this principle of warranty will not extend to them. To this I answer, that both by the civil law, and the common law, they may be sold. I have already observed, that in Domat, 494. he says, that the assignment of a debt, which is a chose in action is, as it were, the sale of a debt; which shews that the sale of a chose in action was well known and recognised by the Roman law ; for there are a great variety of rules laid down by him for their regulation and government. By the common law, they may be also sold ; and the case of Moulsdale *432 y. Birchall, Black. Rep. 820. is in point on this head. There, one Aubins was indebted to Birchall in the sum of 54i. or thereabouts, for goods sold. Birchall being in want of ca-_ t binet work, applied to Moulsdale, a cabinet maker, and offered to sell this debt for cabinet maker’s goods. Whereupon an agreement was made, and Birchall sold, and Moulsdale purchased the said debt of Aubins, and promised to give him wares in payment; and for non-delivery of these cabinet maker’s wares, the action was brought to the value of them. To this there was a demurrer that this was a chose in action, . . and therefore not assignable; but judgment was given for die plaintiff. A writ of error was afterwards brought, and it was removed up into the Exchequer Chamber ; when, after solemn argument before all the judges, the judgment was unanimously affirmed, that the consideration was a good one, and that assumpsit could lie.
A chose in action, may be sold, and as-he'maintained upoau- ,
Having now I think shewn, that a debt or chose in action may be sold., and that such sale is a good consideration in law to ground an assumption on, it follows, as a natural consequence, that every such sale must be governed by the same principles by which every other sale is governed. The first and most obvious principle, then, in every sale is, that selling for a sound price deserves a sound commodity ; and if the thing sold should turn out unsound, or good for nothing, that then the purchase-money should be returned to the purchaser. Doug. 21. This is the doctrine of the civil law, which has been incorporated into the body of our common law, as part of the law of the land.
The reason and justice of these principles occasioned their adoption into the common law. They are not only agreeable to the eternal rules of justice, but absolutely and indispensably necessary for the preservation of fairness and common honesty among mankind. Lord Mansfield, in 2 Burr. 1012. speaking of this kind of equitable action for recovering back money had and received to one’s use, says, “ This kind of equitable action for recovering back money “ which ought not, injustice, to be kept back, is very bene-Oficial, and therefore much encouraged. It lies in all cases *433 iS where the party ought, ex mquo et bono, to refund. It lies 6i for money paid by mistake, or upon a consideration that M fails, or for money got through imposition, extortion, op-r , , M pression, or an undue advantage. In one word, the gist a of this action is, that the defendant, upon the circumstan-M ces of the case, is obliged by the natural ties of justice and “ equity to refund the money.” It is not possible for words to be more expressive, or language more forcible than Lord Mansfield's. They require no comment. In Hawkes v. Saunders, Cowp. 290. the same principles are further laid down and confirmed by all the judges who delivered their opinions, seriatim, on that important occasion. I shall not here repeat them, but shall content myself by referring to them.
From all these authorities, and from the best view I have been able to take of this subject, whether it is considered on the implied undertaking, the nature of the blank indorsement authorising the. party to fill it up with a bill of exchange, or on the equitable ground for money had and received to the plaintiff’s use, it is my opinion that the action. will lie, and that judgment should be for the defendant.

 It is much to be lamented that the learned and able opinions of these judges could not be procured. By some accident or other they have been. lo?t or mislaid.

 Mr. J. Gould, in litis very case, declares, that lie did. not remember that it had ever been adjudged that a note, in which the siuhrcxibcr promised t<* p,i’ ío I. »S* or bearer, was not a hiU of exchange

 It seems that Lord Jlolt's aversion tq promissory notes had prevailed so Sr as to deprive them of all legal existence ; and for some lime before the statute passed^ no action of any kind could be brought on them ^instruments» Even the payee of a- note could not maintain an action against the maker \ he ivas obliged to declare on an indebitatus assumpsit9 disclose the consideration, and give the note only in evidence, "When the statute passed, it restored negotiability to such notes as were drawn payable to order; but to such as were not drawn so, it only restored a legal existence. 4 Durn. & Fast, 1 155, 2 Ld. Raym. 758. 4 Durn. & Easts 154, 155.

 Mr. J. Drayton was also inclined to think that the assignor having received a valuable consideration, raised an implied warranty. At that time I thought differently — I have now changed my opinion; my reasons for it ara given in the latter part of this argument.

 These were 1 Domat, 79. 1 Just. 232. 1 Mod. 113. 1 Ld. Ragm. 683. 3 Ld. Raym. 1241. 12 Mod. 554.

S. C. Radiy reported in Loft, 345.